TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-99-00427-CV







Carole Keeton Rylander, as Successor to John Sharp, Comptroller of Public Accounts


of the State of Texas; and John Cornyn, as Successor to Dan Morales,


Attorney General of the State of Texas, Appellants



v.



Bandag Licensing Corporation, Appellee








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT


NO. 98-06931, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING








 Carole Keeton Rylander, Comptroller of Public Accounts, and Attorney General
John Cornyn (collectively the "Comptroller") appeal from a district court judgment recovered by
Bandag Licensing Corporation ("BLC") in a declaratory judgment action. We will affirm the
judgment.


THE CONTROVERSY


 The judgment below awards BLC recovery of $503,726 paid under protest as
franchise taxes for the years 1992-96, together with attorney's fees and pre- and post-judgment
interest. We will summarize the controversy based on the trial court's findings of fact, none of
which are disputed.

 BLC, a wholly-owned subsidiary of Bandag Corporation ("Bandag"), is a
corporation organized and existing under the laws of Iowa. During the period 1992-96, BLC
possessed a certificate of authority to do business in Texas. See Tex. Bus. Corp. Act Ann. arts.
8.01-.18 (West 1980 & Supp. 2000). During this period, BLC did not own, possess, use, or
maintain any real property or tangible personal property in Texas. BLC did not have salespeople,
employees, independent contractors, or any other type of representatives in Texas, nor did it send
any such persons into Texas. BLC did not have franchises in Texas, did not distribute goods or
services in Texas under a marketing plan or system prescribed in substantial part by BLC, and
did not transact any intrastate business in Texas. Without question, BLC transacted business in
Texas solely through interstate commerce.

 During 1992-96, BLC owned three patents that it licensed to Bandag, its parent
corporation, under a 1985 agreement executed by Bandag and BLC outside Texas. Under the
agreement, Bandag sent royalty payments to BLC's Iowa office; no payments were received in
Texas. The patents and licenses were intangible property rights, not real property or tangible
personal property. During the period 1992-96, the Comptroller's policy provided that the
licensing of such intangibles did not create a "franchise tax nexus" with Texas.

 In BLC's case, "[t]he Comptroller imposed the franchise taxes in issue . . . solely
because BLC held a certificate of authority and was 'authorized to do business in this state' under
§ 171.001(a) of the Texas Tax Code for the period in issue." BLC held its certificate of authority
until December 31, 1998, when the Secretary of State issued BLC a Certificate of Withdrawal.

 The chief dispute between the Comptroller and BLC centers on the trial judge's
conclusions of law that the Comptroller's assessment of franchise taxes against BLC, solely on
the ground that BLC possessed a certificate of authority to do business in Texas, contravened the
Commerce Clause of Article I, Section 8 of the United States Constitution and the due-process-of-law guarantee of the Fourteenth Amendment to that Constitution, as well as section 171.001(c)
of the Texas Tax Code and corresponding Comptroller rules. See U.S. Const. Art. I, § 8, amend.
XIV; Tex. Tax. Code Ann. § 171.001(c) (West Supp. 2000); 34 Tex. Admin. Code §§ 3.546,
.554 (1999).


THE FRANCHISE TAX


 Subject to certain exceptions, Texas law imposes a franchise tax on a corporation
that does business in Texas, that is chartered by the Secretary of State, or that is authorized to do
business in Texas. See Tax Code § 171.001(a)(1) (West Supp. 2000). Conceptually, the tax is
charged for the privilege of transacting business in the state and is justified by the economic
benefits conferred by the state, including the opportunity to realize income and the protection
afforded by Texas law. See Bullock v. National Bancshares Corp., 584 S.W.2d 268, 270 (Tex.
1979); Houston Oil Co. v. Lawson, 175 S.W.2d 716, 723 (Tex. Civ. App.--Galveston 1943, writ
ref'd). The franchise tax extends, however, only "to the limits of the United States Constitution
and the federal law adopted" thereunder. Tax. Code § 171.001(c). 


THE COMMERCE CLAUSE


 By specifically delegating to Congress the power "to regulate Commerce . . .
among the several States," the Commerce Clause implicitly prohibits the states from actions that
interfere with interstate commerce. U.S. Const. art. I, § 8, cl. 3; see Quill Corp. v. North
Dakota, 504 U.S. 298, 309 (1992). The prohibition does not, however, render impermissible all
direct state taxation of interstate commerce. A state tax on a foreign corporation will be sustained
if the "tax [1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly
apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the
services provided by the State." Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977);
see also Vinmar v. Harris County Appraisal Dist., 947 S.W.2d 554, 555 (Tex. 1997); Sharp v.
Hobart Corp., 957 S.W.2d 650, 653 (Tex. App.--Austin 1998, no pet.).

 The initial question in the present case requires a determination of whether BLC's
mere possession of a certificate of authority issued by the Secretary of State--the sole basis for the
Comptroller's claim according to the trial judge's unchallenged finding of fact--satisfies the
requirement that the tax be "applied to an activity with a substantial nexus" to Texas. This
question raises two issues: what is meant by "an activity," and what constitutes a "substantial
nexus" between that activity and the State of Texas? In ordinary usage, the noun "activity" means
the quality or state of being "active," that is to say, being busy or constantly in action. See
Webster's Third New International Dictionary 22 (Philip B. Gove ed., 1961). We believe the
sense of these definitions is inconsistent with the passive state implied in BLC's mere possession
of a license to do business in Texas--the "activity" relied upon by the Comptroller. (1)

 The term "substantial nexus" is a term of art. In the context of sales and use taxes,
the Supreme Court has held that the term requires a physical presence in the taxing state when the
vendor's only activity within the state is interstate communication with its customers via common
carrier and the United States mail. See Quill Corp., 504 U.S. at 311; National Bellas Hess, Inc.
v. Department of Revenue, 386 U.S. 753, 758 (1967). BLC is not physically present in Texas. 
The Comptroller argues, however, that Quill Corp. and Bellas Hess should be limited to the
context of sales and use taxes and that the benefit BLC derives from its possession of a certificate
of authority--the opportunity to do business in Texas under the state's protection regardless of
whether it chooses to exercise that privilege--constitutes the necessary "substantial nexus." (2) The
Supreme Court, however, addressed the flaw in this argument by stating that "[t]here is no
economic consequence that follows necessarily from the use of the particular words 'privilege of
doing business,' and a focus on that formalism merely obscures the question whether the tax
produces a forbidden effect" under the Commerce Clause. Complete Auto, 430 U.S. at 288. 
Although written in the context of sales and use taxes, Quill Corp. and Bellas Hess do not purport
to apply a standard other than the "substantial nexus" test applied in Complete Auto to a "privilege
of doing business" tax in Mississippi.

 Like BLC in the present case, the sole activity the foreign corporations in Quill
Corp. and Bellas Hess conducted was by interstate commerce--communication by United States
mail and common carriers. While the decisions in Quill Corp. and Bellas Hess involved sales and
use taxes, we see no principled distinction when the basic issue remains whether the state can tax
the corporation at all under the Commerce Clause. As construed in Quill Corp. and Bellas Hess,
when the corporation conducts its activity solely through interstate commerce and lacks any
physical presence in the state, no sufficient nexus exists to permit the state to assess tax.

 Given the undisputed findings that the sole "activity" relied upon by the
Comptroller is BLC's passive possession of a license to do business in Texas, that BLC had no
physical presence in Texas, and that the only connection between BLC and the State of Texas was
by way of interstate commerce, we conclude that Complete Auto, Quill Corp., and Bellas Hess
dictated the judgment reached by the trial court in order to comply with the Commerce Clause.


THE DUE PROCESS CLAUSE


 The Due Process Clause requires a definite link--a minimum connection--between
a state and the person, property, or transaction upon which the state imposes a tax. See Quill
Corp., 504 U.S. at 305. The requisite connection is not the same under the Commerce Clause
and the Due Process Clause:

There may be more than sufficient factual connections, with economic and legal
effects, between the transaction and the taxing state to sustain the tax as against due
process objections. Yet it may fall because of its burdening effect upon the
commerce. And, although the two notions cannot always be separated, clarity of
consideration and of decision would be promoted if the two issues are approached
. . . at least tentatively as if they were separate and distinct, not intermingled ones.



Id. at 305-06 (quoting Rutledge, J., concurring in part and dissenting in part, in International
Harvester Co. v. Department of Treasury, 322 U.S. 340, 353 (1944)). (3) Although we held above
that the Comptroller's franchise tax claim here must fall under the Commerce Clause, we will,
as suggested in Quill Corp., discuss the issue separately under the Due Process Clause.

 In Quill Corp., the Supreme Court looked to personal jurisdiction law in evaluating
whether North Dakota violated the Due Process Clause in assessing tax against Quill. See Quill
Corp., 504 U.S. at 307. Quill Corp. declares unequivocally that physical presence in the taxing
state is not required under the Due Process Clause. See id. at 308. Instead, the Court stated that
the relevant exercise is a "flexible inquiry into whether a defendant's contacts with the forum
made it reasonable, in the context of our federal system of Government, to require it to defend
the suit in that state"; the inquiry is directed at whether the "defendant had minimum contacts with
the jurisdiction such that the maintenance of the suit does not offend traditional notions of fair play
and substantial justice." Id. at 307 (quoting International Shoe Co. v. Washington, 326 U.S. 310,
316 (1945); and Milliken v. Meyer, 311 U.S. 457, 463 (1940)) (internal quotation marks omitted). 
Adopting this rule from the law governing in personam jurisdiction, Quill Corp. held the Due
Process Clause did not bar a use tax imposed against a mail-order vendor "that is engaged in
continuous and widespread solicitation of business within the state," although the vendor did so
by interstate communication and was not physically present in the state. See id. at 308.

 It is important for present purposes to note that Quill Corp. attributes the identical
policy reasons to a state's claim of in personam jurisdiction over a person and the state's claim
of jurisdiction to impose a tax against the person:


 Due process centrally concerns the fundamental fairness of governmental
activity. Thus, at the most general level, the due process nexus analysis requires
that we ask whether an individual's connections with a State are substantial enough
to legitimate the State's exercise of power over him. We have, therefore, often
identified "notice" or "fair warning" as the analytic touchstone of due process
nexus analysis.



Id. at 312; see Lawrence Indus., Inc. v. Sharp, 890 S.W.2d 886, 893 (Tex. App.--Austin 1994,
writ denied). 

 In the present case, according to the trial judge's unchallenged findings of fact, the sole
contact relied upon by the Comptroller is BLC's passive possession of a certificate of authority
to do business in Texas. Our courts have consistently held that this kind of contact, standing
alone, provides insufficient contact under the Due Process Clause to subject a party to in
personam jurisdiction. See, e.g., Conner v. Conticarriers & Terminals, Inc., 944 S.W.2d 405,
413-16 (Tex. App.--Houston [14th Dist.] 1997, no writ); Juarez v. United Parcel Serv., 933
S.W.2d 281, 283-86 (Tex. App.--Corpus Christi 1997, no writ); Wenche Siemer v. Learjet
Acquisition Corp., 966 F.2d 179, 180-84 (5th Cir. 1992). Because identical policies underlie the
Due Process Clause in the context of both in personam jurisdiction and the jurisdiction to tax, we
conclude the Comptroller could not constitutionally impose the franchise tax against BLC solely
on the ground that it possessed a certificate of authority to do business in Texas, such a contact
being insufficient, standing alone, under the Due Process Clause as construed and applied in Quill
Corp.. (4)


RECEIPTS FROM INTANGIBLE PROPERTY


 As discussed previously, the Comptroller assigned as error the trial judge's determination
that BLC's certificate of authority, standing alone, did not constitute the substantial nexus with
Texas required by the Commerce Clause. Embedded in the Comptroller's argument under this
point, however, is an apparent contention that the royalty payments received by BLC under its
licensing agreement with Bandag were, by themselves or in conjunction with BLC's certificate
of authority, sufficient to satisfy the substantial-nexus test. We need not address this element of
the Comptroller's argument for the reasons that follow.

 On appeal, the Comptroller has not attacked the following findings made by the trial judge:

  7. The Comptroller imposed the franchise taxes in issue against BLC solely
because BLC held a certificate of authority and was "authorized to do business
in this state" . . . . 


 . . . .


19. . . . BLC and Bandag executed the License Agreement outside the State of
Texas.


20. . . . BLC did not receive any . . . royalty payments in Texas. BLC received
all royalty payments at its office in Muscatine, Iowa.


 . . . .


22. For the period in issue, Comptroller policy was that the licensing of
intangibles, including patents, in Texas did not create franchise tax nexus. 


 . . . .


26. After 1991 BLC did not transact any intrastate business in Texas; BLC
transacted business solely in interstate commerce in Texas during the period
in issue.



(Emphases added.) With respect to the Commerce Clause's requirement of a substantial nexus
between Texas and some BLC activity in the state, we have held that the findings that (1) the
Comptroller imposed the tax "solely" on the basis of BLC's certificate of authority, and that
(2) BLC did not conduct any intrastate business in Texas after 1991 provide sufficient support for
the trial court's judgment.

 After the trial, the Comptroller requested additional findings of fact. For one, she 
requested a finding that "BLC's reported business activities in Texas" consisted of royalties
received from Bandag in specified amounts for each of the years 1991, 1992, and 1998. (The
years 1991 and 1998 are, of course, irrelevant in the present case involving the franchise tax
claimed by the Comptroller only for the years 1992-96.) The trial judge denied the request. If
we assume the royalties resulted from Bandag's use of the patents in Texas, the trial court's
findings furnish no factual foundation for that part of the Comptroller's argument pertaining to
the royalty payments. More importantly, perhaps, the Comptroller has not complained on appeal
that the trial judge erred in refusing to make the findings requested by the Comptroller, assuming
those findings would have furnished the necessary factual foundation. The Comptroller has,
therefore, waived any error in that regard. See Cherne Indus., Inc. v. Magallanes, 763 S.W.2d
768, 770 (Tex. 1989).

 In addition, the only position taken by the Comptroller in the trial court was that
BLC's certificate of authority, standing alone, constituted a sufficient nexus under the Commerce
Clause. "A litigant may not take one position at trial, and then take an inconsistent position on
appeal." 6 Texas Civil Practice § 40.5, at 1054 (Diane M. Allen et. al. eds., 1998 ed.); see, e.g.,
Mandell v. Hamman Oil & Ref. Co., 822 S.W.2d 153, 159 (Tex. App.--Houston [1st Dist.] 1991,
writ denied).


ATTORNEY'S FEES


 The trial court judgment awards BLC relief as follows: (1) a declaration under the
Uniform Declaratory Judgments Act (the "UDJA") that BLC's mere possession "of a certificate
of authority to do business in Texas" did not subject BLC to the franchise tax and (2) a judgment
for attorney's fees as authorized by the Act. See Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001,
.003, .004, .009 (West 1997). We shall discuss in turn the several grounds upon which the
Comptroller contends the trial court erred by awarding attorney's fees.

 The Tax Code provides a statutory remedy for taxpayers who contend a tax is
unlawful or may not legally be demanded. The individual must ordinarily "pay the amount
claimed by the state, and if the person intends to bring suit under this subchapter, the person must
submit with the payment a protest." Tax Code § 112.051 (West 1992). The particulars of the
suit mentioned in section 112.051 are governed by the succeeding sections. See id. §§ 112.052-.156 (West 1992 & Supp. 2000). Among the succeeding sections is section 112.108. As
originally enacted, section 112.108 provided as follows:


[A] court may not issue a . . . declaratory judgment . . . or other similar legal or
equitable relief against the state or a state agency relating to the applicability,
assessment, collection, or constitutionality of a tax or fee covered by this
subchapter or the amount of the tax or fee due.



Id. § 112.108 (West Supp. 2000).

 In R Communications, Inc. v. Sharp, 875 S.W.2d 314 (Tex. 1994), the supreme
court held unconstitutional this version of section 112.108 and sustained a taxpayer's right to
bring a suit for declaratory relief under the UDJA to challenge the legality of an additional sales
tax imposed against the taxpayer. The court reasoned that the above-quoted version of section
112.108 violated the open courts guarantee of the state constitution (5) through the combined effect
of the requirement of prepayment of the taxes, the ban on declaratory judgments, and the
inadequacy of the remedy of awaiting the filing of a collection suit by the Comptroller. See R.
Communications, 875 S.W.2d at 317-18. The opinion contained, however, this cautionary
passage:


 Our holding today should not be construed to imply that the guarantee of
open courts protects declaratory judgment actions per se. The constitutional defect
in the current prohibition against such relief arises from its impact on taxpayers in
combination with other provisions of the existing Code. We do not mandate an
unconditional right to declaratory relief, but only direct that some constitutionally
adequate means of judicial review not dependent on prior payment be provided.



R Communications, 875 S.W.2d at 319.

 In evident response to the decision in R Communications, the legislature amended
section 112.108 in 1995 by adding the following proviso following the term "tax or fee due":


provided, however, that after filing an oath of inability to pay the tax, penalties,
and interest due, a party may be excused from the requirement of prepayment of
tax as a prerequisite to appeal [to the district court] if the court, after notice and
hearing, finds that such prepayment would constitute an unreasonable restraint on
the party's right of access to the courts. The court may grant such relief as may
be reasonably required by the circumstances. A grant of declaratory relief against
the state or a state agency shall not entitle the winning party to recover attorney
fees.



Tax Code § 112.108 (West Supp. 2000).

 If we understand correctly the sense of the 1995 amendment, section 112.108 now
prohibits the issuance of a declaratory judgment of the kind described except upon the filing of
an indigency oath and a determination by the court that the prepayment required by section
112.051 "would constitute an unreasonable restraint on the party's right of access to the courts." 
Id. This construction appears necessary so that the last sentence of the 1995 amendment can have
effect and meaning; if declaratory relief were prohibited in all instances, it would be unnecessary
to specify that attorney's fees are not recoverable upon "[a] grant of declaratory relief against the
state or a state agency." Id.

 In a conclusion of law, the trial court ruled the amended version of section 112.108
unconstitutional and awarded BLC its attorney's fees. The Comptroller contends on appeal that
the trial court erred on several grounds. She argues first that there can be no question of an open
courts violation in the present case because BLC paid the franchise tax deficiency and did not file
an oath of indigency. This argument does not, however, answer BLC's complaint that the
amended version of section 112.108 is void on its face as against the open courts guarantee. And
for reasons that will appear below, BLC's payment of the disputed tax and the availability of an
indigency proceeding have no bearing on the issue of constitutionality.

 The Comptroller argues next that the open courts guarantee cannot apply to section
112.108 because that section modified only a statutory cause of action, not a well-recognized
common law cause of action; and, in such instances, the statutory remedy of section 112.108,
which prohibits the award of attorney's fees in declaratory judgment actions, is exclusive and
mandatory and must be complied with in all respects or the action cannot be maintained. See
Texas Catastrophe Prop. Ins. Ass'n v. Council of Co-Owners of Saida II Tower Condominium,
706 S.W.2d 644, 646 (Tex. 1986); Bullock v. Amoco Prod. Co., 608 S.W.2d 899, 900-01 (Tex.
1980); City of San Antonio v. Heim, 932 S.W.2d 287, 290 (Tex. App.--Austin 1996, writ denied); 
Poly-America, Inc. v. Dallas County Appraisal Dist.,704 S.W.2d 936, 936-38 (Tex. App.--Waco
1986, no writ). We disagree with the theory for two reasons. First, a corporation that pays an
illegal tax to avoid the possible forfeiture of its right to do business in the state "has a legal claim
for its repayment." Austin Nat'l Bank v. Sheppard, 71 S.W.2d 242, 246 (Tex. 1934); see John
Toliver Underwood, Taxation-Taxpayer's Remedies, 16 Tex. L. Rev. 234, 242-44 (1938). This
action is a well-recognized cause of action that antedates even the original enactment of section
112.108. "Second, even if the taxpayers' judicial remedy were purely statutory, the open courts
guarantee would nonetheless prohibit the Legislature from imposing an unreasonable financial
barrier to that remedy." Central Appraisal Dist. v. Lall, 924 S.W.2d 686, 689 (Tex. 1996). (6)

 The Comptroller apparently argues that the revised version of section 112.108 does
not impose an unreasonable financial barrier to a taxpayer's right of access to the courts because 
it provides for an indigency proceeding. Like section 112.108, section 42.08(d) of the Tax Code,
dealing with the ad valorem tax collected by local governments, contained an almost identical
provision for an oath of indigence. See Tax Code § 42.08(d) (West Supp. 2000). In Lall, the
supreme court concluded that the prepayment provision of section 42.08 remained an unreasonable
financial barrier to access to the courts, "regardless of any indigency exception," because the fact
that "affected parties may be able to afford prepayment is irrelevant. The guarantee of
constitutional rights should not depend on the balance in one's bank account." Lall, 924 S.W.2d
at 692 (quoting Texas Ass'n of Business v. Texas Air Control Bd., 852 S.W.2d 440, 450 n.18
(Tex. 1993)). We see no relevant distinction, in this respect, between the indigency exception of
section 42.08(d) and that now found in section 112.108. Like BLC, the taxpayers in Lall did not
invoke the indigency exception. See Id. Following Lall and Texas Association of Business, we
hold the indigency provision of section 112.108 to be irrelevant to the issue of whether that
section constitutes an unreasonable financial barrier to access to the courts. We therefore sustain
the trial judge's conclusion of law holding the amended version of section 112.108
unconstitutional.

 The Comptroller contends the trial court erred by awarding BLC attorney's fees
because the state has not consented to be sued in proceedings like the present case, save in section
112.108, which not only does not authorize a recovery of attorney's fees but in fact forbids their
recovery in a declaratory judgment action. Consequently, the doctrine of governmental immunity
barred the award of attorney's fees to BLC. We disagree.

 The UDJA provides for the recovery of attorney's fees. See Tex. Civ. Prac. &
Rem. Code Ann. § 37.009 (West 1997). In Texas Education Agency v. Leeper, 893 S.W.2d 432,
446 (Tex. 1994), the court held "that by authorizing declaratory judgment actions to construe the
legislative enactments of governmental entities and authorizing awards of attorney fees, the
[UDJA] necessarily waives governmental immunity for such awards." Id. In the present case,
it was necessary for the trial court to construe and determine the constitutionality of the provisions
of the Tax Code discussed above. The opinion in Leeper is not susceptible of a reasonable
interpretation that it authorized attorney's fees only against such local entities as school districts. 
See, e.g., Texas Workers' Compensation Comm'n v. Texas Builders Ins. Co., 994 S.W.2d 902,
909 (Tex. App.--Austin 1999, no pet.).

 Moreover, we believe the prohibition against recovery of attorney's fees in
declaratory judgment actions, contained in section 112.108, is not severable from the remainder
of that section and must fall within the entirety of section 112.108 as an unreasonable financial
barrier against access to the courts. Under our understanding of the revised version of section
112.108, it prohibits the award of attorney's fees in the only cases where the section contemplates
and authorizes declaratory relief--upon the taxpayer's filing an oath of indigency and a judicial
determination that prepayment would constitute an unreasonable restraint on the taxpayer's right
of access to the courts. The action for declaratory relief and the prohibition against attorney's fees
in such actions are mutually dependent and together make up the legislative intent. The former
being an unconstitutional barrier to access to the courts, the latter must therefore fall as well. See
Carrollton-Farmers Branch I.S.D. v. Edgewood I.S.D., 826 S.W.2d 489, 514-15 (Tex. 1992);
Sharber v. Florence, 115 S.W.2d 604, 606 (Tex. 1938); Baker v. Coman, 198 S.W. 141 (Tex.
1917). We hold the trial court did not abuse its discretion in awarding attorney's fees under the
UDJA.

 We affirm the trial court judgment.



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices Kidd and Smith

Affirmed

Filed: May 11, 2000

Publish
1. "[T]he application to do business and the appointment of an agent for service to fulfill
a state law requirement is of no special weight in the present context. Applying for the privilege
of doing business is one thing, but the actual exercise of that privilege is quite another." Ratliff
v. Cooper Lab., Inc., 444 F.2d 745, 748 (4th Cir. 1971).
2. Following Quill Corp., the Supreme Court declared that "[t]he constitutional question
in a case such as Quill Corp. is whether the State has the authority to tax the corporation at all." 
Allied-Signal, Inc. v. Director, 504 U.S. 768, 778 (1992). This question seems to have little to
do with whether the tax in question is a sales tax, an income tax, a franchise tax, a gross receipts
tax, or some other form of tax. The issue is whether the state may impose any kind of tax in light
of the Commerce Clause.
3. In Quill Corp., the court held the North Dakota sales tax contravened the Commerce
Clause even though it passed muster under the Due Process Clause. See Quill Corp. v. North
Dakota, 504 U.S. 298, 317-18 (1992).
4. In Ross Amigos Oil Co. v. State, 138 S.W.2d 798, 801 (Tex. 1940), the court stated
"[t]he law undoubtedly levies a franchise tax against corporations such as this, regardless of
whether or not they do business." Id. (emphasis added). The kind of corporation referred to was
one organized and existing under the laws of the State of Texas. See id. at 798. The Comptroller
refers in its brief to similar statements made in Calvert v. Capital Southwest Corp., 441 S.W.2d
247, 255 (Tex. Civ. App.--Austin 1969, writ ref. n.r.e.), and Federal Crude Oil Co. v. State, 169
S.W.2d 283, 284 (Tex. Civ. App.--Austin 1943, writ ref'd). In each of these, the corporation was
also a Texas corporation. These decisions are unlike the present case which puts in issue the
extraterritorial effect of the Texas franchise tax under the Due Process and Commerce Clauses. 
The statements relied upon are thus inapposite.
5. See Tex. Const. art. I, § 13.
6. We note that the supreme court's recent decision that a plaintiff's failure to comply with
statutory requirements does not deprive a trial court of jurisdiction over the statutory cause of
action further undermines the Comptroller's argument. See Dubai Petroleum Co. v. Kazi, 12
S.W.3d 71, 76 (Tex. 2000) (overruling in part Mingus v. Wadley, 285 S.W. 1084 (Tex. 1926)).



 as school districts. 
See, e.g., Texas Workers' Compensation Comm'n v. Texas Builders Ins. Co., 994 S.W.2d 902,
909 (Tex. App.--Austin 1999, no pet.).

 Moreover, we believe the prohibition against recovery of attorney's fees in
declaratory judgment actions, contained in section 112.108, is not severable from the remainder
of that section and must fall within the entirety of section 112.108 as an unreasonable financial
barrier against access to the courts. Under our understanding of the revised version of section
112.108, it prohibits the award of attorney's fees in the only cases where the section contemplates
and authorizes declaratory relief--upon the taxpayer's filing an oath of indigency and a judicial
determination that prepayment would constitute an unreasonable restraint on the taxpayer's right
of access to the courts. The action for declaratory relief and the prohibition against attorney's fees
in such actions are mutually dependent and together make up the legislative intent. The former
being an unconstitutional barrier to access to the courts, the latter must therefore fall as well. See
Carrollton-Farmers Branch I.S.D. v. Edgewood I.S.D., 826 S.W.2d 489, 514-15 (Tex. 1992);
Sharber v. Florence, 115 S.W.2d 604, 606 (Tex. 1938); Baker v. Coman, 198 S.W. 141 (Tex.
1917). We hold the trial court did not abuse its discretion in awarding attorney's fees under the
UDJA.

 We affirm the trial court judgment.



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices Kidd and Smith

Affirmed

Filed: May 11, 2000

Publish
1. "[T]he application to do business and the appointment of an agent for service to fulfill
a state law requirement is of no special weight in the present con